MILWAUKEE COUNTY PAVERS ASSN., a Wisconsin corporation, B.R. Amon & Sons, Inc., a Wisconsin corporation, Barricade Flasher Service, Inc., a Wisconsin corporation, Roddie Beaudoin & Son Co., a Wisconsin corporation, Boulanger Const. Co., Inc., a Wisconsin corporation, Brinkmann Engineering, Inc., a Wisconsin corporation, James Cape & Sons Co., a Wisconsin corporation, Century Fence, a Wisconsin corporation, Earth, Inc., a Wisconsin corporation, Hanz Contractors, Inc., a Wisconsin corporation, Johnson Sand & Gravel, Inc., a Wisconsin corporation, Lalonde Contractors, Inc., a Wisconsin corporation, Milwaukee General Construction Co., Inc., a Wisconsin corporation, A.E. Oakes, a Wisconsin corporation, Pac–Sac Construction, a Wisconsin corporation, Paving Mix & Construction, a Wisconsin corporation, Pheifer Bros. Const. Co., Inc., a Wisconsin corporation, Reliance Construction Co., Inc., a Wisconsin corporation, Rock Road of Wisconsin, Inc., a Wisconsin corporation, Stoehr Granding Co. Inc., a Wisconsin corporation, Super Excavators, Inc., a Wisconsin corporation, Trierweiler Const. & Supply Co., Inc., a Wisconsin corporation, Vinton Construction Co., a Wisconsin corporation, Zignego Company, a Wisconsin corporation, on behalf of themselves and all similarly situated persons, Plaintiffs,

v.

Ronald R. FIEDLER, individually and in his capacity as Secretary of the Wisconsin Department of Transportation, and David Manning, individually and in his capacity as Wisconsin Department of Transportation Minority Business Programs Director, Defendants.

No. 89–C–0177–C.

United States District Court, W.D. Wisconsin.

April 7, 1989.

Philip J. Bradbury, Melli, Walker, Pease & Ruhly, Madison, Wis., for Zignego Co.

Joseph W. Melli, John R. Sweeney, Melli, Walker, Pease & Ruhly, Madison, Wis., for Milwaukee County Pavers Assoc.

Charles D. Hoornstra, Madison, Wis., for Ronald R. Fiedler.

Brady C. Williamson, Madison, Wis., for amicus curiae Wisconsin Dept. of Transp.

## ORDER

CRABB, Chief Judge.

This case concerns plaintiffs' constitutional challenge to Wis.Stat. § 84.076 which provides that the State of Wisconsin should reserve $4 million in construction contracts for "disadvantaged" businesses. In an order dated February 27, 1989, 707 F.Supp. 1016, I found for the purpose of deciding plaintiffs' motion for a preliminary injunction that businesses were deemed eligible for the disadvantaged business program on the basis of an irrebuttable presumption that those of a specified race, national origin, and gender were socially disadvantaged. I thus determined that plaintiffs had a better than negligible chance of succeeding on the merits of their constitutional claim that the statute violated the equal protection clause of the Fourteenth Amendment because it made racial and ethnic classifications unsupported by the requisite findings of past discrimination. Because I found that plaintiffs had also shown that they had no adequate remedy at law, that they would suffer irreparable harm if the injunction was not granted, that the harm to them if the injunction was not issued was greater than the harm to defendants if it was issued, and that the injunction would not harm the public interest, their motion for a preliminary injunction was granted.

The preliminary injunction was granted based on my provisional understanding of the case. I noted that my view of the merits of plaintiffs' claim might change if the state could show that the presumption that women and minorities are socially disadvantaged is rebuttable or that the state program is a subsidiary of a federal program and that the state is thus entitled to rely on congressional findings of past discrimination to validate its program.

■ Now before the court is defendants' motion to dissolve the preliminary injunction or, in the alternative, to modify it. In support of the motion, defendants state they have new arguments and evidence demonstrating that the statutory presumptions are rebuttable and that the state program is the "alter-ego" of a federal program. They also argue that if the injunction is not dissolved it should be modified to clarify certain ambiguities in its language.

Because of the expedited briefing schedule established on plaintiffs' motion for a preliminary injunction, defendants were given little time to prepare their materials in opposition. The injunction that has issued affects many in addition to the parties to this action, in particular, the disadvantaged businesses that would otherwise have received contracts. Furthermore, the constitutionality of a state statute is a matter of public concern that should be resolved promptly and equitably. In such circumstances, the presentation of materials that might lead to a new view of the merits of the case is a justifiable reason for

reconsidering the granting of the preliminary injunction. *See Canal Authority of State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974).

The previous order in this case contained extensive and detailed factual findings. I will not repeat them all here but will include only those portions that are relevant to the resolution of this motion. I include additional factual findings that are derived from the undisputed affidavits and exhibits submitted by the parties on the motion to dissolve the injunction and from the testimony at the March 21, 1989 hearing on defendants' motion.

## FACTUAL FINDINGS

In 1983, Congress enacted a quadrennial transportation authorization act entitled the Surface Transportation Assistance Act of 1982, Pub.L. No. 97–424, 96 Stat. 2097, 2100. Section 105(f) of the Act provided as follows:

Except to the extent that the Secretary determines otherwise, not less than 10 per centum of the amounts authorized to be appropriated under this Act shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals as defined by section 8(d) of the Small Business Act (15 U.S.C. section 637(d)) and relevant subcontracting regulations promulgated thereto.

The Department of Transportation promulgated detailed regulations implementing this section. 48 Fed.Reg. 33432 *et seq.,* codified at 49 C.F.R. part 23, subpart D (1986).

The subsequent authorization act, the Surface Transportation and Uniform Relocation Assistance Act of 1987, contained a similar provision. Pub.L. 100–17, § 106(c), 101 Stat. 132, 145. Section 106(c) of the Act contained language essentially identical to section 105(f) of the 1982 Act establishing a 10% goal for expenditures with disadvantaged businesses. In addition, it included women as a group presumed to be disadvantaged, refined the definition of small business, required states to compile an annual listing of disadvantaged business enterprises, and required the Secretary of Transportation to establish minimum uniform criteria for states to use in determining whether a business is disadvantaged.

Section 105(f) of the 1982 Act and § 106(c) of the 1987 Act apply only to programs under the Federal Highway Administration and Urban Mass Transit Administration. They do not apply to funds authorized for programs under the Federal Aviation Administration, the Federal Railroad Administration, or the National Highway Traffic Safety Administration.

On October 21, 1987, the Department of Transportation promulgated amendments to the regulations required by the 1987 Act. 52 Fed.Reg. 39225–31. The current regulations are codified at 49 C.F.R. part 23 (1988).

The practice of the Federal Highway Administration in its administration of section 106(c) is to permit states to meet the 10% goal by using disadvantaged businesses either as subcontractors or as prime contractors. When a disadvantaged business is a prime contractor the total dollar amount of the contract may be counted towards the state's required 10% goal even if some of the contract is subcontracted to non-disadvantaged sub-contractors.

49 C.F.R. § 23.45(k), as amended at 52 Fed.Reg. 39229–30, permits states to implement set-aside programs as one portion of an overall program to meet the goals of section 106(c) provided the state demonstrates the need for the set-aside program and provided that adequate competition among disadvantaged businesses is available. The set-aside programs allow certain contracts to be awarded to the successful bidder from a pool of bidders limited exclusively to disadvantaged businesses. The Federal Highway Administration may require states to adopt set-aside programs if the state cannot otherwise meet its 10% goal.

The Wisconsin Department of Transportation receives approximately $200 million each year in federal highway funds. The state's total highway construction budget is approximately $300–350 million a year.

The department expects to receive $195 million in fiscal year 1988–89 for contracts administered by the department and $214 million in total federal funding. Receipt of the funds is contingent upon compliance with the statutory and regulatory requirements concerning disadvantaged businesses. 49 C.F.R. 23.68.

In order to comply with the requirements of the 1982 Act and the regulations promulgated thereunder, Wisconsin enacted a general Disadvantaged Business Enterprise Program. The program is currently in place to comply with the requirements of the 1987 Act. Plaintiffs have not challenged the constitutionality of this program. Defendant Manning, the Disadvantaged Business Programs Director for the Wisconsin Department of Transportation, is charged with ensuring compliance with section 105(f) of the 1982 Act and 106(c) of the 1987 Act and is designated as Wisconsin's liaison with the United States Department of Transportation for the disadvantaged business program.

As a recipient of federal highway aid, each year pursuant to the federal requirements and the general disadvantaged business program that the state has enacted to implement those requirements, the Wisconsin Department of Transportation must and does submit to the United States Department of Transportation a goal for that year's expenditures with disadvantaged businesses in federally assisted highway contracts. Every four months, the department reports its progress toward meeting the goal. Any goal of less than 10% must be approved by the United States Department of Transportation under stringent waiver criteria established at 49 C.F.R. § 23.65.

In fiscal years 1987–1989 Wisconsin has established a disadvantaged business enterprise goal of 10%. In 1987, 13.1% of highway construction expenditures were made with disadvantaged businesses. In fiscal year 1988 the state expected that 15.7% of expenditures would be made with disadvantaged businesses.

More than 90% of the disadvantaged firms that have received state funds have been subcontractors working under non-disadvantaged prime contractors. Of the 1,364 prime contracts let for highway projects since 1984, only 67 have been awarded to disadvantaged firms.

Prior to the enactment of the contested program, non-disadvantaged prime contractors complained to the department about the inability of the disadvantaged businesses to perform satisfactorily. Disadvantaged businesses complained to the department about their inability to compete with non-disadvantaged businesses for prime contracts because of economic barriers they have encountered.

To remedy these complaints, to assist disadvantaged businesses to become viable and competitive prime contractors, and to promote the award of more contracts to disadvantaged prime contractors so that the state could more efficiently meet its 10% participation goal under section 106(c), the Wisconsin legislature enacted the contested demonstration and training program in 1988. 1987 Wisconsin Act 399, codified as Wis.Stat. § 84.076. The Act states in relevant part:

*84.076. Disadvantaged business demonstration and training program.*

*(1) Definitions.* In this section:

(a) "Disadvantaged individual" means a minority group member, a woman or any other individual found to be socially and economically disadvantaged by the department as provided in 49 CFR 23.62, unless successfully challenged as provided in 49 CFR 23.69.

(b) "Disadvantaged business" means a sole proprietorship, partnership, joint venture or corporation that fulfills all of the following requirements, as certified by this department:

1. Is at least 51% owned by one or more disadvantaged individuals who are U.S. [sic] citizens or persons lawfully admitted to the United States for permanent residence ...

2. Its management and daily business operations are controlled by one or more of the disadvantaged individuals who own it.

(c) "Minority Business" has the meaning given under s. 560.036(1)(e)1.

(d) "Minority group member" has the meaning given under s. 560.036(1)(f).

*(2) Administration.* (a) The secretary shall administer a demonstration and training program for the purpose of developing the capability of disadvantaged businesses to participate in construction projects.... Beginning in fiscal year 1988–89, from the amounts appropriated under s. 20.395(3)(bq), (bv), (bx), (cq), (cv), (cx), (dq), (dv), (dx), (fq), (fv), (fx), (hq), (hv), and (hx), the secretary shall allocate $4,000,000 each fiscal year for the awarding of contracts under this section....

(b) The secretary shall establish requirements for programs of preapprenticeship training and management and technical assistance designed to develop the expertise of disadvantaged individuals and disadvantaged businesses in transportation construction.

*(3) Bids, contracts.*

... The secretary shall establish a list of disadvantaged businesses that are eligible to submit bids for contracts awarded under this section and subcontractors who meet the requirements under sub. 4(b). Each bid submitted under this section shall include the agreement specified under sub. (4) and all of the following conditions:

(a) A goal that at least 25% of the total number of workers in all construction trades employed on the project will be disadvantaged individuals.

(b) A subcontracting plan that provides sufficient detail to enable the secretary to determine that the prime contractor has made or will make a good faith effort to award at least 20% of the total contract amount to bona fide independent disadvantaged business subcontractors.

*(4) Contractor responsibilities.* Each contractor shall agree to do one of the following in its bid submitted under sub (3).

(a) 1. Assure that the contractor has developed a program of preapprenticeship training that satisfies the requirements established by the secretary under sub. (2)(b) and has experience in providing the training to disadvantaged individuals; and

2. Assure that the contractor has developed and has experience in providing a program of management and technical assistance to disadvantaged business subcontractors....

(b) Obtain from a subcontractor that has experience in providing training to disadvantaged individuals a program of preapprenticeship training that satisfies the requirements established by the secretary under sub. (2)(b)....

The program is in effect only through June 30, 1991. The department plans to audit the program prior to its termination to evaluate its success.

The appropriations referred to in section (2)(a) of the statute follow a statutorily created pattern. The last letter of each series indicates the source of appropriated funds; "q" indicates state funds, "v" indicates local funds, and "x" indicates federal funds.

Contracts let under the statute are paid for entirely from the $4 million allocated to the program.[1]

The standards and procedures used to determine which individuals and firms qualify as disadvantaged under § 84.076 are identical to those the state has been using to comply with the Surface Transportation Assistance Act of 1982 and the Surface Transportation and Uniform Relocation Assistance Act of 1987.

The Wisconsin disadvantaged business demonstration and training program is similar to those in three of the other five states in this administrative region of the Federal Highway Administration (Minnesota, Ohio, Illinois).

On July 29, 1988 defendant Manning and defendant Fiedler, the Secretary of the Wisconsin Department of Transportation,

---

**1.** I have inferred this fact from the parties' testimony at two hearings before the court and from evidentiary material indicating the bids the state has received on contracts already let.

presented to the United States Department of Transportation a review of the state's disadvantaged business enterprise program. The review included the following discussion of the contested statute.

[The disadvantaged business enterprise demonstration and training program] became effective on July 1, 1988. It is a development and training program for the purposes of increasing the capability of disadvantaged businesses to participate on Wis DOT projects. Each year a total of $4 million in projects will be identified to be bid on only by certified DBE [Disadvantaged Business Enterprise] prime contractors. The successful prime bidder will be required to make good faith efforts to award at least 20% of the total contract dollar amount to DBE subcontractors. In addition, each project will have an employment goal of 25% of the total workforce to consist of disadvantaged group members. The prime DBE contractor will also be required to establish an approved training program for disadvantaged individuals working on the project.

These two initiatives should allow DBEs to become more viable and competitive contractors.

The report justifying Wisconsin's goal of 10% participation in fiscal year 1989 listed several steps the department would take to attain that goal. Among the steps listed were implementation of the demonstration training program and development of disadvantaged prime contractors.

The report was approved by the Federal Highway Administration on August 31, 1988.

The department designated four projects to be let under Wis.Stat. § 84.076 (STH 38, South Howell Avenue, Portland Cement Concrete Pavement, Milwaukee County; STH 38, South Howell Avenue, Bridge at Root River, Milwaukee County; STH 190, West Capitol Drive, 145th Street, Waukesha County; STH 28, Sheboygan Falls–I43, Sheboygan County). The four projects are each on the Federal–Aid Urban System or Federal–Aid Primary System of highways in Wisconsin.

A representative of the United States Department of Transportation participated in the selection of the projects for the demonstration and training program. In November 1988 and February 1989, the Wisconsin Department of Transportation officially requested that the Federal Highway Administration approve federal construction funding for the four projects. On December 21, 1988, the department officially requested from the Federal Highway Administration advance authorization of federal engineering funding for the four projects. On December 22, 1988 and January 13, 1989, the Federal Highway Administration approved these requests.

The funding for each project is approximately 75% federal and 25% state (the Portland Cement project includes 3% local funding). The funding derives exclusively from the $4 million allocated to the demonstration and training program under Wis.Stat. § 84.076.

The department anticipates that the federal funding for all highway construction in the state fiscal year 1989 will total $195 million and that $19.5 million must be expended with disadvantaged businesses in order to fulfill the 10% goal mandated by section 106(c) of the 1987 Act. The total amount of federal funds appropriated for fiscal year 1988–89 that is subject to the department's allocation of $4 million for the disadvantaged business demonstration and training program is approximately $97 million. The department intends to meet the $19.5 goal through funds expended under the contested statute as well as through funds expended in its general disadvantaged business program.

In order for expenditures under the contested program to be counted toward the 10% goal, the program must meet the federal requirements set out in section 106(c) of the 1987 Act and 49 C.F.R. § 23. Both the department and the Federal Highway Administration foresaw that the federal funds expended with disadvantaged businesses under the disadvantaged business demonstration and training program would be counted towards the state's 10% goal. All the federal funds expended that were to

be in the four projects authorized for fiscal year 1988–89 and enjoined by the previous order of this court were to be counted towards the state's 10% goal.

## OPINION

Defendants contend that dissolution of the preliminary injunction enjoining the operation of Wis.Stat. § 84.076 entered by this court on February 27, 1989 is justified because they have presented new evidence and arguments demonstrating that the presumptions of the contested statute are rebuttable and because they have shown that the state statute implements federal law. Their arguments concerning whether the statutory presumptions are rebuttable merely repeat those they have already made and for this reason I have not made any additional factual findings concerning whether the presumptions are rebuttable. A motion for dissolution or modification of an injunction is not an opportunity to reargue a losing claim; that may be done on appeal. Thus, the analysis in this opinion proceeds on the assumption that the Wisconsin statute includes classifications based on race, national origin, and gender. The statute can be found to be constitutional only if the racial and ethnic classifications are constitutional in this particular instance.[2]

Defendants' arguments and evidentiary materials concerning the relation of state and federal law are largely new, however. Initially when the parties addressed the motion for a preliminary injunction, they did not consider whether the state program could be considered a subsidiary of a federal program and thus could rely on federal fact finding. The issue was first raised in the opinion granting the motion for a preliminary injunction. The arguments and materials now presented merit consideration. Because I find after review of the evidentiary materials and applicable law

that the defendants have shown that the contested state program is a subsidiary to a federal program and that the state may rely on congressional findings of past discrimination, the likelihood of plaintiffs' success on the merits of their claim has diminished considerably. Because plaintiffs can no longer show that they have a better than negligible chance of success, the preliminary injunction will be dissolved. Accordingly, it will not be necessary to consider defendants' alternative request for modification of the injunction or the parties' proposed stipulated modifications.

*Analysis*

Plaintiffs have argued consistently that the outcome of this action is determined by the United States Supreme Court's recent opinion *City of Richmond v. J.A. Croson,* —— U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). As noted in the extensive discussion of *Croson* in my earlier opinion, that decision concerns the constitutionality of affirmative action programs enacted by states and local governments. The standards articulated in *Croson* do not apply to federal affirmative action programs or to state programs which are subsidiary to them. The challenged Richmond program was not related to any federal program and did not involve any federal funds or federal oversight. The Court emphasized that Congress may enact race-based remedial legislation that might be impermissible if enacted by a state or local government. —— U.S. at ——, 109 S.Ct.at 717–20.

In my earlier opinion I applied the *Croson* analysis because defendants had not suggested that the challenged program should be considered anything but a state program and thus subject to the stringent standards set out in *Croson*. However, if the state program is subsidiary to a federal program, it should be analyzed as a federal program to which *Croson* would not apply. The applicable standard for analyzing the

**2.** Defendants argue that cases considering the constitutionality of race-based classifications and, in particular, minority business programs, are inapplicable to this case because this action concerns a challenge to a *disadvantaged* business program. However, since in my previous opinion I determined that the operative categories of the statute were race, national origin, and gender and not disadvantage, I now consider the challenged statute to provide for a *minority* business program. Accordingly, the cases considering the constitutionality of race-based classifications are applicable to this case.

constitutionality of federal affirmative action programs that impose requirements on states is found in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the only Supreme Court decision addressing a federally imposed minority preference.[3]

In *Fullilove*, the Court considered the constitutionality of a requirement in the Public Works Employment Act of 1977, Pub.L. 95–28, 91 Stat. 116, that 10% of the federal funds granted by the Act to a state or local government be expended with minority businesses. *Id.* at 453, 100 S.Ct. at 2762. Writing for a plurality of the Court,[4] former Chief Justice Burger surveyed the legislative history of the Public Works Employment Act and related legislation and determined that "Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior dis-

---

**3.** Plaintiffs argue that after *Croson, Fullilove* cannot be relied on as precedent. Their contention is refuted by the Court's frequent reliance on *Fullilove* in the *Croson* opinion and its explicit distinction between the standards to be applied to review of federal and state programs. *See* — U.S. at ——–——, ——–——, 109 S.Ct. at 717–20, 726–30; — U.S. at ——, 109 S.Ct. at 719 ("our treatment of an exercise of congressional power in *Fullilove* cannot be dispositive here."); *see also* — U.S. at ——–——, 109 S.Ct. at 734–38 (Scalia, J., concurring in the judgment) ( [W]ithout revisiting what we held in *Fullilove* ..., I do not believe our decision in that case controls the one before us here).

Nor have the Court's actions since its decision in *Croson* indicated that it considers *Fullilove* to be less than completely intact. Since the *Croson* decision issued, the Court has considered four cases concerning affirmative action programs that were on its docket pending a decision in *Croson*. The disposition of three of those cases is irrelevant to this case or to the legitimacy of *Fullilove* because the cases concerned state or local programs unrelated to any federal program. *See Michigan Road Builders Ass'n, Inc. v. Milliken,* — U.S. ——, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), granting certiorari to and summarily affirming without dissent 834 F.2d 583 (6th Cir.1987) (finding unconstitutional state set-aside because state provided no showing of past discrimination); *Higgins v. City of Vallejo,* — U.S. ——, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989), denying certiorari without dissent to 823 F.2d 351 (9th Cir.1987) (upholding flexible city plan supported by findings); *City of South Bend v. Janowiak,* — U.S. ——, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989), denying certiorari without dissent to 836 F.2d 1034 (7th Cir.1988) (finding unconstitutional city hiring plan unsupported by statistically significant findings).

The disposition of the fourth case also has little relevance to these issues. The Court granted certiorari to and vacated a decision by the Court cf Appeals for the Eleventh Circuit upholding a local minority business program implementing federal requirements promulgated under the Surface Transportation Assistance Act of 1978. *H.K. Porter Co. v. Metropolitan Dade Co.,* — U.S. ——, 109 S.Ct. 1333, 103 L.Ed.2d

804 (1989), granting certiorari to and vacating 825 F.2d 324 (11th Cir.1987). Justices Brennan, Marshall, Blackmun and Stevens would have denied certiorari. Although the case also concerned the local implementation of a federally mandated affirmative action program, the legislative context of the program was very different from that which this court confronts. The Surface Transportation Assistance Act of 1978 did not contain any provision for an affirmative action program. The Department of Transportation independently established a regulatory program. In an amici brief submitted to the Court on the petition for certiorari, the United States recommended that certiorari be denied because the statutory framework had changed so substantially that the issues presented by the case were unlikely to recur. Brief for the United States as Amici Curiae at 10, *H.K. Porter,* — U.S. ——, 109 S.Ct. 1333. Thus, the Court's summary disposition of the case gives no indication that the validity of *Fullilove* is in question or that federal programs are to be considered in a new light after *Croson*.

A recent decision of the Court of Appeals for the District of Columbia Circuit also supports the conclusion that the analysis articulated in *Fullilove* should still be applied to federally sponsored minority preferences. *See Shurberg Broadcasting of Hartford, Inc. v. Federal Communications Commission,* 876 F.2d 902 (1989). In *Shurberg*, the court of appeals found unconstitutional a program of the Federal Communications Commission that permitted licensees in danger of losing their licenses in a noncomparative hearing to sell the license at a reduced price to a minority buyer. In analyzing whether there existed sufficient congressional findings underlying the program and whether the program was narrowly tailored, the two separate opinions of each of the judges in the majority relied extensively on *Fullilove. See id.* at 911, 914–18 (Silberman, J.); *id.* at 928–30 (MacKinnon, J.).

**4.** Justices White and Powell joined the Court's opinion. Justice Powell also wrote a lengthy concurring opinion. Justice Marshall filed an opinion concurring in the judgment in which Justices Brennan and Blackmun joined. Justices Rehnquist, Stewart and Stevens dissented.

crimination." *Id.* at 477–8, 100 S.Ct. at 2774.

After emphasizing the deference the Court must have towards a co-equal branch of government, *Fullilove,* 448 U.S. at 472, 100 S.Ct. at 2771, the plurality examined the possible bases for Congress' authority to enact race-conscious statutes and to impose race-conscious statutory requirements upon the states. It considered first Congress' Spending Power and the concurrent power to further federal objectives by conditioning receipt of federal funding on compliance with federal statutory requirements, as well as Congress' Commerce Power to regulate inequities affecting interstate commerce. *Id.* at 473–476, 100 S.Ct. at 2772–2774. It found also that the enforcement power in section 5 of the Fourteenth Amendment granted Congress broad authority to enforce the equal protection commandment and that this power extended to the enactment of race-conscious remedial legislation that imposes requirements on the states. *Id.* at 477–78, 100 S.Ct. at 2774–75.

The plurality stressed the flexible nature of the 10% requirement: a waiver could be obtained if sufficient minority businesses were not available or if a minority business charged an unreasonable price for its services, and an administrative complaint procedure was available. *Id.* at 487–88, 100 S.Ct. at 2779–80. The Chief Justice suggested that the constitutionality of the statute was premised on these "assurance[s] that application of racial or ethnic criteria will be limited to accomplishing the remedial objectives of Congress and that misapplications of the program will be promptly and adequately remedied administratively." *Id.* at 487, 100 S.Ct. at 2779.

As Justice O'Connor noted in her opinion in *Croson,* the principal opinion in *Fullilove* "did not employ 'strict scrutiny' or any other traditional standard of equal protection." —— U.S. at ——, 109 S.Ct. at 717. However, the principal opinion read in conjunction with Justice Powell's concurrence, 448 U.S. at 495–99, 507, 100 S.Ct. at 2783–85, 2789, and the Court's subsequent opinions in *Wygant v. Jackson Board of Edu-*

*cation,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), and *Croson* suggests that *Fullilove* should be read to require some congressional findings of past discrimination necessitating remedial action and a showing that the remedial program is narrowly tailored to achieve its ends. *Cf. Shurberg,* 876 F.2d at 914–18 (Silberman, J.) and 928–30 (MacKinnon, J.) (striking down Federal Communications Commission minority preference because program was not narrowly tailored).

Applying the *Fullilove* analysis to the present case, it becomes clear that three questions must be addressed: 1) whether Wisconsin's disadvantaged business demonstration and training program is an integral subsidiary of a federal statute and thus constitutionally grounded on Congress' Spending Power and its enforcement power under section 5 of the Fourteenth Amendment; 2) whether Congress made sufficient findings of past discrimination upon which the state may rely; and 3) whether the federal statute and the state statute are narrowly tailored to achieve their remedial goals. I will address each question in turn.

*1. Relation of State and Federal Programs*

Section 106(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub.L. 100–17 mandates that "[e]xcept to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts authorized to be appropriated under [this Act or its predecessor, the Surface Transportation Assistance Act of 1982] shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." The term "small business concern" is defined by section 2[3] of the Small Business Act, 15 U.S.C. § 632, and the term "socially and economically disadvantaged individuals" is defined by section 2[8](d) of the Small Business Act, 15 U.S.C. § 637(d), except that the 1987 Act adds women to that definition. Section 106(c) also requires states to compile annually a list of small business concerns and to adhere to minimum uniform criteria for certi-

fying businesses as disadvantaged. The criteria include "on-site visits, personal interviews, licenses, analysis of stock ownership, listing of equipment, analysis of bonding capacity, listing of work completed, resume of principal owners, financial capacity, and type of work preferred." § 106(c)(4), codified at 49 C.F.R. § 23.45(f) [as amended at 52 Fed.Reg. 39230].

■ The regulations implementing section 106(c) impose additional requirements on states that wish to receive federal highway funds. The state must submit its overall goals to the Federal Highway Administration. 49 C.F.R. § 23.64(c). If the goal is 10% or more, the state must describe the methodology used to reach its overall goal and its goals for individual contracts, publish a public notice of the goals, and consider specified factors in determining the goals. 49 C.F.R. § 23.64(e) (incorporating by reference 49 C.F.R. § 23.45(g) [as amended at 52 Fed.Reg. 39230]). If the goal is less than 10%, the state must request a waiver of the requirement. Prior to requesting a waiver, the state must consult with private groups that might have relevant information, must ensure that the governor of the state concurs in the request, and must justify its lower goal by documenting its efforts to locate disadvantaged businesses, to make disadvantaged businesses aware of the program, to encourage and develop disadvantaged businesses, to overcome any legal or other barrier impeding participation, and by explaining the unavailability of disadvan-

taged businesses, and the characteristics of the minority population in the state and their effects on availability. 49 C.F.R. § 23.64(e), 49 C.F.R. § 23.65. The 10% requirement will be waived if the Administrator of the Federal Highway Administration determines that the state is making all appropriate efforts to increase participation of disadvantaged businesses and that the proposed goal represents a reasonable expectation of participation. 49 C.F.R. § 23.66(b). The regulations also set out the procedures the state must follow to allow third party challenges to determinations that particular businesses qualify as economically and socially disadvantaged. 49 C.F.R. § 23.69. Failure to comply with any of these requirements subjects the state to loss of all its federal highway funding. 49 C.F.R. § 23.68.

49 C.F.R. § 23.45(k) contains an optional method of compliance.

> Where not prohibited by state or local law and determined by the recipient to be necessary to meet MBE [Minority Business Enterprise] goals, procedures to implement MBE set-aside shall be established. MBE set-asides shall be used only in cases where at least three MBEs with capabilities consistent with contract requirements exist so as to permit competition.

The section is authorized by § 106(c) of the 1987 Act. *See* 49 C.F.R. § 23 (citation to authority under which regulation was promulgated) [as amended by 52 Fed.Reg. 39229].[5]

---

5. It is not entirely clear how the Department of Transportation has determined that the set-aside procedure is authorized by the 1987 Act. The regulation was originally promulgated as part of a regulatory affirmative action program adopted prior to 1982 under the authority of a variety of transportation acts, Title VII of the Civil Rights Act of 1964, and Executive Order 12138. *See* 49 C.F.R. § 23 (citation to authority under which regulation was promulgated). At least two courts have found these cited authorities to be insufficient and have held that the regulation does not reflect Congress' intent and cannot be validated by reliance on congressional findings. *See M.C. West, Inc. v. Lewis,* 522 F.Supp. 338 (M.D.Tenn.1981); *Central Alabama Pavers, Inc. v. James,* 499 F.Supp. 629 (M.D.Ala. 1980). *Cf. S.J. Groves & Sons Co. v. Fulton Co.,* 696 F.Supp. 1480 (N.D.Ga.1987) (Federal Avia-

tion Act provides authorization for set-asides in airport construction).

When the Surface Transportation Assistance Act of 1982 was enacted, the department did not consider the Act to be statutory authorization for the section. Furthermore, the regulations implementing the 1982 Act, 49 C.F.R. § 23.63 (1987) and Appendix A to 49 C.F.R. § 23, subpart D (1987), make clear that § 23.45(k) did not apply to the disadvantaged business program created by that Act. Following the enactment of the 1987 Act the department revised the statutory authorization citation for § 23 to include the 1987 Act as authorization for the entire section, including § 23.45(k). *See* 52 Fed. Reg. 39229. However, the revision as it appears in the Federal Register does not indicate the basis for the change or how to reconcile the

In order to ensure that it continues to receive federal highway funds, the State of Wisconsin enacted a general disadvantaged business program that conforms exactly to the federal requirements and has complied with all the requirements. Wisconsin experienced some problems in the implementation of the general program. Non-disadvantaged prime-contractors complained to the Wisconsin Department of Transportation about the inability of disadvantaged businesses to perform satisfactorily. Disadvantaged businesses complained to the department about their inability to compete with non-disadvantaged businesses for prime contracts because of economic barriers they have encountered. Furthermore, the department has independently determined that the paucity of disadvantaged prime contractors hinders the department's successful implementation of the federal program. More than 90% of the disadvantaged firms that have participated in the program have been subcontractors working under prime contractors. The 10% goal may be met by the participation of disadvantaged businesses as prime contractors or as sub-contractors. However, when a disadvantaged business is a prime contractor the entire dollar amount of the contract is counted toward the 10% goal even if portions are subcontracted to non-disadvantaged businesses. When a disadvantaged business is a sub-contractor only the dollar amount of the sub-contract may be counted toward the goal. Thus, it is more efficient for the state to meet its goal by using disadvantaged businesses as prime contractors.

In order to remedy these problems in the implementation of the requirements of section 106(c), the Wisconsin legislature enacted the contested disadvantaged business demonstration and training program. Wis. Stat. § 84.076 provides that $4 million of funds appropriated for highway construction shall be allocated to projects that may be bid on only by disadvantaged prime contractors. The set-aside is only one aspect of the program, albeit the contested aspect. The statute includes comprehensive provisions for training disadvantaged individuals and businesses in order to remedy the problem the state has identified with its current implementation of the federal program: that most disadvantaged businesses currently are unable to obtain prime contracts. It provides management and technical assistance to disadvantaged businesses so that they are better equipped to bid for prime contracts, and it mandates preapprenticeship training of disadvantaged individuals so that more may enter the construction trade. Wis.Stat. § 84.076(4). Furthermore, as is appropriate for a demonstration and training program, the program is of limited duration and expires June 30, 1991.

In most respects, the contested statute is fully integrated in Wisconsin's implementation of section 106(c) of the Surface Transportation and Uniform Relocation Assistance Act. The state statute adopts federal definitions and criteria and federal funds expended under the statute count towards compliance with the federally mandated 10% goal. Since the enactment of the statute, the state has authorized the letting of four projects under it. These projects were approximately 75% federally funded. Thus, 75% of the total amount of funds expended with disadvantaged businesses under the contracts counted towards the state's 10% goal.

However, it must be noted that $4 million that the state must allocate each year for use under the statute need not be from federal sources. The monies allocated may be state or local funds. As noted above, monies allocated thus far have been approximately 75% from federal sources and 25% state and local sources. Defendants have stated in their brief, although they have not supported the statement with any

current inconsistency between § 23.45's use of the term minority and the 1987 Act's use of the term "disadvantaged."

Although these are issues that might merit further attention at a later stage of this litigation, I do not think that they substantially affect

the analysis of the constitutionality of the state program. Even if § 23.45 does not provide direct authorization of a set-aside program, direct authorization may not be necessary since the program is only a means of implementing the Congressional intent motivating the 1987 Act.

evidentiary materials, that the allocation can never consist totally of federal funds because the federal authorizing statute requires some matching state funding for every project. However, there is no indication that in the future the allocation could not be entirely or primarily from state and local sources.

The following discussion of the integration of the state and federal programs and the constitutionality of Wis.Stat. § 84.076 is premised on the fact that most of the monies allocated for use under the statute have been federal and will count towards Wisconsin's compliance with the federal 10% goal. The same analysis and conclusions would not apply if the monies were not primarily federal and were not counted toward the 10% goal. Then the state program would be more akin to a state program modeled on a federal program than one implementing and subsidiary to a federal program. Such a program probably would not be constitutional in the absence of findings of past discrimination as discussed in my previous opinion.[6] Accordingly, although I conclude that plaintiffs are unlikely to succeed on their claim that the contested statute is unconstitutional as it has been applied, it does not appear that the statute could survive intact a facial challenge, and thus I decline to hold that plaintiffs would be unlikely to show that is unconstitutional on its face and must be narrowed.

Insofar as the contested statute is analyzed as it has been applied thus far, the integration of the federal and state programs is essentially total. The definitions of small business and disadvantaged individual are identical to those used in the

Act, in the implementing regulations, and in Wisconsin's other disadvantaged business program. *Compare* Wis.Stat. §§ 84.-076(1)(b), 84.076(3)(c), 560.036(1)(e)1 and 49 C.F.R. §§ 23.62; 15 U.S.C. § 637(d) (the Small Business Act).[7] The contested statute adopts the same criteria for determining who is socially and economically disadvantaged and how that determination may be contested. Those who are eligible for the program are drawn from the same directory of disadvantaged businesses the state compiles under the federal regulation. Disadvantaged businesses must provide the same information and meet the same qualifications to be eligible for the demonstration and training program and the state's more general disadvantaged business program (with the exception that to participate in the challenged program disadvantaged businesses must show that they have the requisite experience and financial resources to be a prime contractor). The programs are administered together. Expenditures of federal funds under the contested program are to be counted towards the state's general 10% goal. Thus, most of the expended funds count towards that goal. The projects that have been designated to be let under the program are part of the Federal–Aid Urban System of Federal–Aid Primary System of highways. The Federal Highway Administration considers the contested program to be one component of the state's program of compliance.

Furthermore, set-aside programs such as Wisconsin's are explicitly permitted under 49 C.F.R. § 23.45(k) as a method of implementing § 106(c) of the 1987 Act. In order to adopt a set-aside program under § 23.45(k) the state must determine the

---

**6.** I do not address here what percentage of the $4 million allocated under the statute or expended on a particular project must be federal for the program or statute to be deemed primarily federally funded. Projects that receive 70–75% of their funding from federal sources, such as the ones the state currently plans to let under the program, are primarily federally funded. I express no opinion whether projects receiving a lesser percentage of federal funds are primarily federally funded or whether the requirement of primarily federal funding applies to the total $4 million allocation, the allocation for each individual project, or both.

**7.** In my previous opinion I indicated that the definition of minority in Wis.Stat. § 84.076 differed from the federal definition because the state included persons from Burma, Thailand and Portugal while the federal program did not. *Citing* 49 C.F.R. § 23, Appendix A (analysis of § 23.62). However, I had neglected to consult the 1987 changes in the regulations which show that those persons are now included in the federal definition as well. *See* 49 C.F.R. § 23, Appendix A (analysis of § 23.62) [as amended at 52 Fed.Reg. 39231].

program to be necessary in order to meet its 10% goal and must ensure that at least three qualified business are available to bid. The state has determined the program to be necessary. The state received complaints from disadvantaged businesses that they faced barriers to becoming prime contractors. It also determined that it could meet its 10% goal more efficiently if it could use more disadvantaged prime contractors.

The fact that Wisconsin exceeded its 10% goal in 1987 and was projected to exceed that goal in 1988 does not prevent the state from choosing to adopt the set-aside under § 23.45(k). First, Wisconsin may choose a more efficient method of reaching its goal, particularly if, as here, the state believes that the chosen method will enhance its overall implementation of the federal statute by improving the ability of disadvantaged businesses to participate equitably in the federally mandated program. Second, Congress has made clear that the 10% goal is a minimum and not a maximum. *See* H.Conf.Rep. No. 100–27, 100th Cong., 1st Sess. (Joint Explanatory Statement of the Committee of Conference) (1987), U.S.Code Cong. & Admin.News 1987, p. 66.

█ Where, as in this case, a state program is enacted to implement federal legislation imposing specified requirements on the state and the legislation is an integral part of the federal-state legislative framework, the state program should be considered a subsidiary element of the federal legislation. The Supreme Court reached that conclusion in *Fullilove* where it addressed the affirmative action program enacted by the Public Works Employment Act of 1977. 448 U.S. 448, 100 S.Ct. 2758. As discussed earlier, the Act, like the Surface Transportation and Relocation Assistance Act of 1987, required that state recipients of federal funds authorized by the Act expend 10% of the funds with minority businesses. In a plurality opinion the Court held that Congress could impose that requirement on the states under its expansive powers even if the states could not constitutionally enact similar legislation on its own initiative. *Id.* at 473–84, 100 S.Ct.

at 2772–78. *See also id.* at 515–16, n. 14, 100 S.Ct. at 2793–94 n. 14 (Powell, J., concurring) *Croson,* —— U.S. at ——–——, 109 S.Ct. at 717–20 (interpreting *Fullilove* ).

The Court appeared to base its holding primarily on § 5 of the Fourteenth Amendment and on the spending power. The Fourteenth Amendment grants Congress power to enact race-conscious remedial legislation and to regulate the procurement practices of state recipients of federal funds. 448 U.S. at 476–77, 100 S.Ct. at 2773–74. Use of the Spending Power is a traditional method of imposing such requirements on states:

> Congress has frequently employed the Spending Power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives. This Court has repeatedly upheld against constitutional challenge the use of this technique to induce governments and private parties to cooperate voluntarily with federal policy.

.   .   .   .   .

> Insofar as the MBE program pertains to the actions of state and local grantees, Congress could have achieved its objectives by use of its power under § 5 of the Fourteenth Amendment. We conclude that in this respect the objectives of the MBE provision are within the scope of the Spending Power.

*Id.* at 474, 478, 100 S.Ct. at 2772, 2775.

█ In *Fullilove* the plaintiffs challenged the federal act and not the state implementing legislation. However, the Court's analysis suggests that the state implementing legislation was constitutional as well. If Congress can require states to comply with race-conscious requirements, state legislation enacted to create the means of fulfilling those requirements must also be permitted. As I noted in the earlier opinion entered in this case, a district court examining a state law implementing the Surface Transportation Assistance Act of 1982 and 49 C.F.R. § 23 has come to a similar conclusion. *Carpenter v.*

*Dole,* slip op. 85–527–CIV–5 (E.D.N.C. March 6, 1987). In that case the court pointed out that the state plan was not a state program, "but rather is the final step in the implementation of a congressionally created federal remedial action. *Id.* at 22.

Recently, the Supreme Court has reiterated this vision of Congress' ability to impose requirements on the states. In *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), the Court upheld federal legislation that conditioned receipt of federal highway funds on the enactment of state laws permitting sale of alcohol only to persons over the age of twenty-one. Citing *Fullilove,* the Court held that Congress may attach conditions to the receipt of federal funds so long as those conditions are not unconstitutional and are in the general interest as Congress defines that interest. *Id.* 107 S.Ct. at 2795–8. Similarly, in *Papasan v. Allain,* 478 U.S. 265, 267, 106 S.Ct. 2932, 2935, 92 L.Ed.2d 209 (1985), the Court noted that where Congress requires a state to undertake certain actions, the relevant inquiry is whether the federal policy is constitutional. If it is and if the state is bound to adhere to that policy, the state's action is constitutionally permissible. *Id.* at 289, 106 S.Ct. at 2946.

Contrary to plaintiffs' assertions, this analysis does not apply only when the state has no choice but to adhere to the federal requirements. Here the state could choose to forgo federal highway funding. Furthermore, it could attempt to receive a waiver of the mandated 10% goal. Finally, the state enjoys limited discretion in deciding how to achieve the 10% goal and to exceed the goal if it can. I find unconvincing the argument that because the state can choose to give up over $200 million dollars in federal highway funding its compliance is discretionary. In *Fullilove* and in *South Dakota v. Dole* the states enjoyed the "option" of forgoing federal funds and in *Fullilove* the states could request a waiver of compliance. The Supreme Court did not consider these factors relevant in its determination; neither do I. The fact that the state need not implement a set-aside program to reach its 10% goal if it

can reach it otherwise also does not indicate that the program should not be considered an extension of congressional legislation. That Congress gives states optional methods of compliance does not mean that compliance is not required and that the state does not need to undertake the available steps most suited to ensuring compliance.

### 2. Congressional Findings

■ Because the Wisconsin disadvantaged business demonstration and training program challenged in this lawsuit is properly considered a subsidiary element of the federal legislation, the state may rely on the congressional findings underlying the federal legislation. *See Carpenter,* slip op. at 23 (there is no authority for the position "that a state agency must enter independent specific findings of past state governmental discrimination in order for its voluntary participation in a congressionally enacted remedial program to pass constitutional muster.")

The Supreme Court's decision in *Croson* is not to the contrary. In *Croson* the Court held that state and local laws employing racial and ethnic classifications must be supported by specific evidence of discrimination in that state or locality against those aided by the statute. — U.S. —––—, 109 S.Ct. at 722–30. The City of Richmond could not rely on congressional findings of nationwide discrimination in the construction trade because "Congress explicitly recognized that the scope of the problem would vary" across the nation. — U.S. at —, 109 S.Ct. at 727. The contested Wisconsin program is not a purely state program. It is a subsidiary element of the federal nationwide Surface Transportation and Uniform Relocation Assistance Act of 1987. Thus, *Croson's* evidentiary requirements are inapplicable. Federal statutes and their subsidiaries are properly supported by congressional findings of nationwide discrimination. *Cf. Fullilove,* 448 U.S. 448, 100 S.Ct. 2758. (suggesting that state statutes implementing affirmative action program of the Public Works Employment Act are properly supported by the congressional findings

of nationwide discrimination underlying the Act).

However, it is necessary to examine the congressional findings underlying the Surface Transportation Act of 1982 and the Surface Transportation and Uniform Relocation Assistance Act of 1987 to determine whether they provide an adequate showing of past discrimination justifying the enactment of the federal program which the contested Wisconsin statute implements.[8] When enacting race-conscious legislation, Congress is not constitutionally required to make the specific findings of past discrimination that states and local governments must make. In *Fullilove*, the plurality looked first to the legislative history of the Public Works Employment Act of 1977 to determine whether Congress had before it sufficient evidence of past discrimination in the construction industry to justify passage of the race-conscious legislation. 448 U.S. at 463, 100 S.Ct. at 2767. The Act included no explicit findings of past discrimination. *Id.* at 478, 100 S.Ct. at 2774. However, the Court did not require such findings. Instead, the plurality opinion emphasized that the legislation "must be considered against the background of ongoing efforts directed towards deliverance of the century-old promise of equality of economic opportunity." *Id.* at 463, 100 S.Ct. at 2767. As Justice Powell wrote in his concurrence:

> Congress is not expected to act as though it were duty bound to find facts and make conclusions of law. The creation of national rules for the governance of our society simply does not entail the same concept of recordmaking that is appropriate to a judicial or administrative proceeding. Congress has no responsibility to confine its vision to the facts and evidence adduced by particular parties. Instead, its special attribute as a legislative body lies in its broader mission to investigate and consider all facts and opinions that may be relevant to the resolution of an issue. One appropriate source is the information and expertise that Congress acquires in the considera-

tion and enactment of earlier legislation. After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area.

*Id.* at 502–03, 100 S.Ct. at 2787.

The Supreme Court in *Croson* addressed the constitutionality of a local minority preference and thus did not explicitly consider what evidentiary requirements the Fourteenth Amendment imposes on Congress. However, three members of the majority implicitly reiterated the holding of *Fullilove* that Congress may address societal discrimination without making specific findings of past discrimination. —— U.S. at ——–——, 109 S.Ct. at 717–20 (states must make specific findings expressly because states enjoy fewer remedial powers than Congress and thus must do *more* than Congress to justify race-conscious remedial legislation).

One court of appeals has suggested that *Croson* might have increased the evidentiary requirements Congress must meet. In *Shurberg Broadcasting of Hartford, Inc v. Federal Communications Commission*, 876 F.2d 902 (D.C.Cir.1989), the Court of Appeals for the District of Columbia Circuit struck down a federal minority preference. The separate opinions by the two judges in the majority did not focus on what evidentiary requirements Congress had to fulfill because both found the federal program unconstitutional on the ground that it was not narrowly tailored. However, in dicta Judge Silberman suggested that the congressional findings the Supreme Court considered in *Fullilove* were the minimum necessary to satisfy the Constitution. *Id.* at 915 ("I do not read the Court's dicta in *Croson* to mean that Congress may act without *some* quantum of particularized evidence of the effects of societal discrimination in the relevant industry, and in that regard the general findings of minority underrepresentation in the

8. Of course, the constitutionality of the federal legislation is not at issue here. I consider the findings supporting the federal acts only to determine whether they provide a constitutionally sufficient foundation for the challenged Wisconsin law.

broadcasting field differ, in my view, from the congressional findings the Court encountered in *Fullilove*.").

I do not agree that the Supreme Court's decision in *Croson* necessitates a revision of the evidentiary standards imposed on Congress or a holding that the evidence Congress had before it in *Fullilove* was the minimum that is constitutionally acceptable. *See also Shurberg*, 876 F.2d at 940 –41 (Wald, J., dissenting). However, a determination of the question is not necessary for the resolution of this motion because the legislative context and history of the Surface Transportation Assistance Act of 1982 and the Surface Transportation and Uniform Relocation Assistance Act of 1987 show that Congress had before it adequate evidence of past discrimination in the construction trade to meet the evidentiary requirements established in *Fullilove*.

What became the affirmative action provision of the 1982 Act, § 105(f), was introduced on the House floor as an amendment by Representative Parren Mitchell and was adopted without debate by a voice vote. 128 Cong.Rec. 28927 (December 6, 1982). Representative Mitchell had also sponsored the essentially identical affirmative action provision of the Public Works Employment Act addressed in *Fullilove*. Introducing the amendment to the Surface Transportation Assistance Act, he referred explicitly to the Public Works Employment Act provision and the Supreme Court decision upholding its constitutionality and stated that the current amendment attempted to remedy the same problems as those identified by the earlier legislation. *Id.* No comparable provision was introduced in the Senate. The conference report adopted the amendment as introduced, except that it added the introductory phrase, "Except to the extent the Secretary determines otherwise." *See* 48 Fed.Reg. 33432 (reviewing legislative history of Act). This additional language permitting waivers was consistent with the wording and application of the Public Works Employment Act.

The Surface Transportation and Uniform Relocation Assistance Act of 1987, the Act currently in effect, includes a version of § 105(f) of the 1982 Act (it adds women as a disadvantaged group, refines the definition of small business, and imposes additional, uniform criteria on states). Pub.L. 100–17 § 106(c). Between the enactment of the two authorization bills, Congress held several hearings evaluating the success of the 1982 Act and gathering data in preparation for reauthorization of federal highway funding in the 1987 Act. *See, e.g.,* Review of the Implementation of the Surface Transportation Assistance Act of 1982: Hearings Before the Subcommittee on Surface Transportation of the House Committee on Public Works and Transportation, 98th Cong., 1st Sess. (1983); The Disadvantaged Business Enterprise Program of the Federal–Aid Highway Act: Hearings Before the Subcommittee on Transportation of the Senate Committee on Environment and Public Works, 99th Cong., 1st Sess. (1985); The Federal–Aid Highway Program: Hearings Before the Subcommittee on Transportation of the Senate Committee on Environment and Public Works, 99th Cong., 1st Sess. (1985); Extension of the Nation's Highway, Highway Safety, and Public Transit Programs: Hearings Before the Subcommittee on Surface Transportation of the House Committee on Public Works and Transportation, 99th Cong., 1st Sess. (1985).

A preliminary review of these hearings does not reveal extensive testimony documenting past discrimination in the construction industry. However, Representative Mitchell testified at two of these hearings as to the general need for the provision and referred explicitly to hearings by the House Subcommittee on Small Business documenting the need for remedial measures. *See* Senate Hearing on the Disadvantaged Business Enterprise Program of the Federal–Aid Highway Act at 5–6; House Hearing on Extension of the Nation's Highway Programs at 1350–54 ("Mr. Chairman, I offer for your information and files the [numerous] items presented to the Subcommittee on SBA and SBA Authority, Minority Enterprise and General Small Business Problems."). Furthermore, the Senate Committee Report on the 1987 Act stated that "[t]he Committee has con-

sidered extensive testimony and evidence on the bill's DBE provision, and has concluded that this provision is necessary to remedy the discrimination faced by socially and economically disadvantaged persons attempting to compete in the highway and mass transit construction industry." S.Rep. No. 100-4, 100th Cong., 1st Sess. (1987), U.S.Code Cong. & Admin.News 1987, p. 66.

As this review shows, when Congress enacted the disadvantaged business provision currently in effect, it had before it the legislative history of the Public Works Employment Act of 1977 and relied upon that history explicitly. It has already been determined that the evidence underlying that Act met constitutional standards, *Fullilove*, 448 U.S. at 453-67, 100 S.Ct. at 2762-69, and that Congress may rely on information and expertise gained from the consideration of one bill when it enacts similar legislation later. *Id.* at 463-67, 502-03, 100 S.Ct. at 2767-69, 2787. Thus, Congress could rely on the findings underlying the Public Works Employment Act of 1977 when it enacted virtually identical provisions in the Surface Transportation Assistance Act of 1982 and the Surface Transportation and Uniform Relocation Assistance Act of 1987. The hearings and Senate committee report preceding the enactment of the 1987 Act provide further evidentiary support for the legislation. Thus, when the legislation is seen in context, it is clear that Congress had before it ample evidence of past discrimination in the construction trade and could constitutionally enact race-conscious remedies and impose them upon the states.

### 3. Scope of Legislation

■ To pass constitutional scrutiny, the means employed by race-conscious remedial federal legislation must be tailored to the problem that has been identified.[9] *Ful-*

*lilove*, 448 U.S. at 485-89, 510-14, 100 S.Ct. at 2778-80, 2791-93. To determine whether that requirement has been met here, I will first examine the scope of the federal legislation and the general Wisconsin disadvantaged business program that implements it. I will then consider whether the set-aside provision of the contested Wisconsin statute is sufficiently narrow.

The Supreme Court's decisions in *Bakke*, *Fullilove*, *Wygant*, and *Croson* do not develop an explicit analytical framework for determining whether a program is narrowly tailored and instead consider on an *ad hoc* basis the elements of the program contested in each case. *See University of California Regents v. Bakke*, 438 U.S. 265, 315-19, 98 S.Ct. 2733, 2761-63, 57 L.Ed.2d 750 (1978); *Fullilove*, 448 U.S. at 481-89, 100 S.Ct. at 2776-80; *Wygant*, 476 U.S. at 279-83, 106 S.Ct. at 1849-51; *Croson*, — U.S. at ———, 109 S.Ct. at 727-30. In the recent *Shurberg* decision, the Court of Appeals for the District of Columbia Circuit distilled two principles from these cases: to be narrowly tailored a program must be reasonably related to the interests it seeks to vindicate and must not unduly burden innocent nonminorities. *Shurberg*, 876 F.2d at 958 (per curiam); *see also id.* at 915 (Silberman, J.) (the concept of narrowly tailored contains three elements: that the degree of preference be tied to effects of past discrimination; that there have been prior consideration of race-neutral alternatives; and that there be no unfair burden on innocent nonminorities); *id.* at 929 (MacKinnon, J.) (to be narrowly tailored a program must bear some relationship to the identified government interest and must minimize the burden on innocent nonminorities). This framework is helpful for analyzing the statutes at issue in this case.

---

**9.** Although the plurality opinion in *Fullilove* uses the term "narrowly tailored," 448 U.S. at 480, 100 S.Ct. at 2776, the required fit between ends and means is not as demanding as that in later cases in which the Court has required that programs adopted by local governments must be "narrowly tailored," *Croson*, — U.S. at ———, 109 S.Ct. at 727-30; *Wygant*, 476 U.S. at 279-84, 106 S.Ct. at 1849-52. In his concurring opinion in *Fullilove*, Justice Powell articulates the test as a requirement that the means selected be "equitable and reasonably necessary." *Id.* at 510, 100 S.Ct. at 2791. This formulation seems to reflect more accurately what has been required of congressional, as opposed to other, programs.

The factors the Court considered in *Ful-lilove* fit within this framework. Both the plurality opinion and Justice Powell's concurrence noted particular aspects of the Public Works Employment Act of 1977 that limited its scope to ensure that it was reasonably related to the interests Congress sought to vindicate. The minority preference was adopted only after other remedies had failed. *Id.* at 463–68, 100 S.Ct. at 2767–70, *id.* at 511, 100 S.Ct. at 2791 (Powell, J., concurring). The Act operated prospectively only. *Id.* at 481, 100 S.Ct. at 2776. It permitted a waiver of the Act's ten percent goal if states could show that their best efforts could not succeed in meeting the goal. *Id.* at 487–89, 100 S.Ct. at 2779–80; *id.* at 514, 100 S.Ct. at 2793 (Powell, J., concurring). The use of racial and ethnic criteria was based on rebuttable presumptions that ensured that only disadvantaged businesses would be aided by the legislation. *Id.* at 489, 100 S.Ct. at 2780. The percentage chosen as a goal was not unreasonable. *Id.* at 513, 100 S.Ct. at 2792 (Powell, J., concurring). The Act included a complaint procedure to ensure that only bona fide minority firms were eligible. *Id.* at 482, 100 S.Ct. at 2776. And finally, it was a pilot project of limited duration and subject to congressional review before reenactment. *Id.* at 489, 100 S.Ct. at 2780; *id.* at 513, 100 S.Ct. at 2792 (Powell, J., concurring). Justice Powell's concurrence also emphasized that the percentage goal involved a minimal amount of all construction work in the nation and thus would not excessively burden innocent nonminorities.

*Id.* at 514–15, 100 S.Ct. at 2793–94 (Powell, J., concurring).

Section 106(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 was deliberately modeled on the legislation considered in *Fullilove*. S.Rep. No. 100–4, 100th Cong., 1st Sess. 11 (1987), U.S.Code Cong. & Admin.News 1978, p. 75. The federal program it creates and the state's general disadvantaged business program implementing it thus contain virtually all the limitations the Court identified in *Fullilove*. They operate prospectively. A waiver is available. The criteria of eligibility are rebuttable, thus assuring that only minorities who are economically disadvantaged may participate in the program.[10] The program has a procedure by which third parties may challenge the eligibility of certified firms. The state program also is of limited duration, expiring in 1990. Finally, the percentage chosen is the same as that upheld in *Fullilove*.[11] Because the program includes these elements, its scope is sufficiently tailored.

The contested Wisconsin statute is intended to improve the state's implementation of the federal program. It is narrowly tailored to meet that end and thus is also narrowly tailored to remedy the discrimination Congress has identified. The challenged statute ensures that the minority preference is reasonably related to acheiving state and federal goals by incorporating all of the limitations identified above with the exception of the reasonable percentage goal.[12] The statute does not establish a goal. Rather it sets aside $4 million

**10.** The earlier conclusion that plaintiffs were likely to succeed on their claim that the contested statute violated the equal protection clause hinged on the determination that the racial and ethnic classifications in the statute are not rebuttable. A person of an enumerated racial or ethnic group is irrebuttably presumed to be socially disadvantaged.

However, as in *Fullilove,* such a person is not irrebuttably presumed to be economically disadvantaged. *Fullilove* addressed a *minority* business program. Unlike the program at issue here, it did not attempt to use racial and ethnic categories as a means of defining social disadvantage. Thus the question of whether a member of an ethnic or racial minority was irrebuttably presumed to be socially disadvantaged did

not arise. Under that program a minority could be found to be ineligible only if he or she was not economically disadvantaged. The same is true of the statute challenged in this case. Thus, the criteria applied under this statute are rebuttable to the same extent that the criteria in *Fullilove* were rebuttable.

**11.** The parties have not informed the court of the total amount of construction in the State of Wisconsin. However, it is likely that 10% of the federal highway aid ($19.5 million in fiscal year 1989) is not an excessive proportion of that amount.

**12.** Wis.Stat. § 84.076 is repealed by its own terms effective June 30, 1991.

annually to be used in construction projects for which only "disadvantaged" businesses may bid. This distinction does not render the statute impermissibly over-inclusive. The state has determined that it can more efficiently and equitably implement the federal program if it encourages the development of disadvantaged prime contractors. The statute does this by setting aside a reasonable portion (approximately 25%) of the federal funds it expends to meet the federally mandated 10% goal. Moreover, the set-aside is not the only method used to meet the federal goal; rather it is a limited alternative to the general disadvantaged business program. Finally, the set-aside itself is only one element of the well-designed training program enacted in Wis. Stat. § 84.076 intended to improve the business skills of disadvantaged businesses.

The program also meets the second indicia of a narrowly tailored program because it remedies the identified problem without unduly burdening innocent nonminorities. Only $4 million of a total highway construction budget of approximately $300–350 million, or less than 1.5% of the total construction budget, is at issue. Nonminority contractors as a group are not injured because 98.5% of the state's construction business is still available to them. Furthermore, the nonminority contractors have prospective opportunities in the private sector. Nor are individual nonminority contractors unduly burdened. There has been no showing that the projects let under the contested statute have particular characteristics that make them invaluable to an individual contractor. *Cf. Shurberg,* 876 F.2d at 917 (plaintiff lost "unique" opportunity to be awarded at a comparative hearing a liscence for a particular station in a limited market); *id.* 932–34 (MacKinnon, J.) (plaintiff's loss was more equivalent to the layoff's considered in *Wygant* than the lost contracting opportunities considered in *Fullilove* ). For these reasons, I find that the contested statute is narrowly tailored to better implement the federal disadvantaged business program and to achieve the problem Congress has identified: discrimination in highway construction.

## 4. Modification of the Injunction

█ Defendants have asked this court to dissolve the preliminary injunction previously entered. The Court of Appeals for the Seventh Circuit has stated the standard for dissolution of an injunction as follows:

Is the irreparable harm to the plaintiff if the injunction is dissolved, weighted by the probability that dissolution would be a mistake because the plaintiff would go on to win at trial, greater or less than the irreparable harm to the defendant if the injunction is not dissolved, weighted by the probability that allowing the injunction to continue in force would be a mistake because the defendant, not the plaintiff, will win at trial?

*Centurion Reinsurance Co., Ltd. v. Singer,* 810 F.2d 140, 143 (7th Cir.1987).

The foregoing discussion shows that insofar as the contested Wisconsin statute allocates primarily federal funds to be set-aside for primarily federally funded projects, it is the subsidiary of a federal program, it is supported by adequate findings of past discrimination, and it is narrowly tailored. However, insofar as the statute permits the allocation of funds that are not primarily federal or projects that are not primarily federally funded, it cannot be considered part of the federal legislation and thus suffers the constitutional defects discussed in the previous opinion in this case. Due to this revision in my view of the merits of plaintiffs' constitutional challenge, it now appears unlikely that they will succeed in a challenge to the constitutionality of the statute as it is applied. However, they are likely to succeed in a facial challenge to that portion of the statute authorizing state and local funding in unspecified percentages and amounts.

Because I find that plaintiffs are still likely to succeed on merits of a facial challenge, dissolution of the injunction is not warranted. However, because I now find that plaintiffs are unlikely to succeed in a challenge to the state's current application of the statute, it is appropriate to consider whether the injunction should be modified to permit plaintiffs to implement the statute through the use of primarily federal

funds. Although the decision to modify an injunction is less far-reaching than a decision to dissolve it, the relevant considerations are generally the same. Thus, I will apply the standard for granting a motion to dissolve an injunction articulated in *Centurion Reinsurance* to determine whether modification is proper.

In the decision granting plaintiffs' motion for a preliminary injunction, I found that the balance of harms weighed in favor of enjoining the operation of the statute. In particular, I found that the violation of plaintiffs' constitutional rights constituted irreparable harm and that the injunction of an unconstitutional statute was in the public interest. However, the analysis was premised on the assumption that the statute was unconstitutional.

Defendants have since shown that the statute as it has been applied is an elaboration of a federal law and that it should be found to be constitutional under the standards of analysis applied to federal statutes. Thus, plaintiffs can no longer contend that they will be irreparably harmed by the violation of their constitutional rights or that the injunction is in the public interest. Plaintiffs may suffer monetary loss if the decision to modify the injunction is mistaken. However, enjoining a state statute is a strong remedy and should be imposed sparingly. Where, as here, the plaintiffs' likelihood of success on the merits of its challenge to the application of the statute is slim, the plaintiffs will suffer only a speculative loss at most (profits that would have been earned if a particular plaintiff, of the many plaintiffs in this suit, had won a contract that now will go to a disadvantaged contractor), and the injunction is proper.

### ORDER

IT IS ORDERED that the order entered February 27, 1989 is modified to read as follows:

Defendants are enjoined from letting under Wis.Stat. § 84.076 contracts for any projects that are not funded primarily with federal funds. Defendants are not enjoined from executing the three contracts already let under Wis.Stat. § 84.076 or from letting under the statute other contracts for projects funded primarily with federal funds.